UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRANK B. LOMBARD, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Criminal Case No. 09-313 (GK) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

## MEMORANDUM OPINION

Petitioner Frank Lombard ("Lombard" or Petitioner) has filed a Motion to Vacate his criminal sentence pursuant to 28 U.S.C. § 2255 [Dkt. No. 34]. Lombard argues that his sentence of 327 months imprisonment for sexual exploitation of a minor should be vacated because his attorney rendered ineffective assistance during plea negotiations with the Government, at sentencing, and on direct appeal. Upon consideration of the Motion, Opposition [Dkt. No. 48], Reply [Dkt. No. 51], Petitioner's Response to the Court's April 25, 2014 Order [Dkt. No. 54], the Government's Response to the Court's Order [Dkt. No. 55], and the entire record herein, and for the reasons set forth below, Petitioner's Motion shall be **denied**.

## I. Background

### A. The Offense and Plea Agreement

On December 17, 2009, Lombard pleaded guilty to one count of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a). See Plea Agreement [Dkt. No. 16]. The Statement of the Offense, which Lombard signed and agreed "fairly and accurately describe[d] [his] actions," stated that he sexually molested his five-year old adopted son on several occasions over a period of two years. Statement of the Offense ¶¶ 5, 8 [Dkt. No. 17]; see also Plea Agreement ¶ 5. It further stated that he broadcast webcam videos of these activities to other pedophiles in Internet chat rooms using the moniker "perv dad for fun" and, on at least one occasion, invited other Internet pedophiles to come to his home to molest his son as well. Statement of the Offense ¶¶ 6, 8. It also indicated that Lombard told the undercover officer investigating the offense that "the abuse of the child was easier when the child was too young to talk or know what was happening," and that, as the child grew older, he "had drugged the child with Benadryl during the molestation" to make it easier. Id. ¶ 4.

In exchange for Lombard's admission of guilt, the Government promised that, at Lombard's sentencing, it would advocate for a sentence in the "low end" of the Sentencing Guidelines range, which the parties agreed was 262-327 months.

However, the Plea Agreement expressly stated that the Government's sentencing position would not be binding on the Court. Plea Agreement at 4. The Agreement emphasized that Lombard's sentence would be "determined solely by the Court," and that "[t]he Government cannot, and does not, make any promise or representation as to what sentence [Lombard] will receive." Id. In signing the Agreement, Lombard represented that he had read the Agreement in its entirety, agreed that the facts set forth in it were accurate, discussed it with his attorney, fully understood it, was satisfied with the legal services provided by his attorney, and was acting voluntarily and of his own free will. Id. at 8.

## B. Sentencing Submissions

In advance of Lombard's sentencing, both parties submitted sentencing memoranda and the Probation Office prepared a Presentence Investigation Report ("PSR"), which included a detailed account of Lombard's criminal conduct and his personal and familial circumstances, education, professional background, and mental health history. See generally PSR ¶¶ 1-58.

The PSR stated that Lombard was a licensed clinical psychologist with a bachelor's degree in psychology and a Master of Social Work, and that, at the time of his arrest, he worked as an Associate Director for the Center for Health Policy at Duke University; that he was in a long-term relationship with a

committed partner who was unaware of his criminal activities; and that he had two adopted sons, ages five and thirteen (the younger of which was the victim of Lombard's offense). PSR ¶¶ 45, 54-58. The PSR further indicated that Lombard reported having had loving parents and "a good childhood in which all of his material/emotional needs were met." PSR ¶ 42. However, he told the probation officer that, during his adolescence, he was sexually molested by a teacher on one occasion and raped by two older men on another occasion, neither of which he ever reported to his parents or law enforcement. PSR ¶¶ 43-44.

The Government filed a Sentencing Memorandum acknowledging that Lombard had taken responsibility for his criminal conduct and that it had agreed to cap its sentencing allocution to the "low end" of the Sentencing Guidelines range. See Gov't's Sent. Mem. ¶¶ 1, 16 [Dkt. No. 27]. The Government later submitted a Supplemental Sentencing Memorandum for a Downward Departure under Section 5K1.1 of the Sentencing Guidelines based on Lombard's assistance to law enforcement authorities. Nevertheless, the Government emphasized its view that Lombard had "betrayed the trust of his adopted child in the most deplorable way imaginable" and "[n]othing in [his] background justifies the indignity to which he subjected his child." Id. at 9.

Lombard filed a Sentencing Memorandum asking the Court to impose the statutory minimum sentence of 180 months in light of his acceptance of responsibility, cooperation with authorities, lack of any prior criminal record, and the fact that he himself had been a victim of child sexual abuse. See Def.'s Request for Imposition of a Sentence Outside of the Sentencing Guideline Range at 1 [Dkt. No. 23]. Lombard also submitted letters from both of his parents.

### C. The Sentencing Hearing

Lombard's sentencing hearing took place on March 29, 2010. At the outset, the Court stated that it had read and closely considered all of the materials submitted by the parties and the probation office. Transcript of Sentencing Hearing ("Tr.") 4. Counsel for the Government then summarized the evidence of the offense, which included the reports of an undercover officer and a confidential source, Internet chat session logs, archived computer images, and the Petitioner's own admissions. Tr. 7-9.

In response to questioning from the Court, counsel for the Government confirmed that Lombard's activities formed a "pattern of conduct" that had persisted for well over a year. Tr. 12. He also explained that the harm to Lombard's adopted son was especially pernicious and long-lasting because "once someone has distributed a child['s] pornographic picture or video over the internet, there is no getting it back. . . . [I]mages can

simply be traded, and traded, and traded . . . . It is just out on the Internet, and tradable, distributable, and viewable to whoever comes across it." Tr. 10.

Lombard's attorney, Christopher Shella, argued that Lombard should receive a lenient sentence because he "took responsibility for this case from day one when he was first arrested" and "immediately spoke to the investigators, gave them information[] [and] was willing to do what was required, what was right in this case." Tr. 15-16. Shella emphasized that Lombard was still available to render such assistance to law enforcement. Tr. 16. He also pointed out that Lombard had been sexually abused himself and recently had been diagnosed with bipolar disorder. Tr. 18. Shella further stated that he firmly believed Lombard had come into a "self-realization" of his wrongdoing and had accepted responsibility for it. Tr. 17-18.

Lombard addressed the Court, acknowledging that his actions were "reprehensible," and that he had hurt his "kids," parents, siblings, neighbors, church, co-workers, and "really everyone that I have ever cared about." Tr. 19-20. Lombard indicated that he was in psychiatric treatment, which had helped him see that, although he could not undo his conduct, he could "try to make sure that I never do it again," and he promised that, "if I get out of prison I won't ever hurt anyone again." Tr. 21.

The Court then made its findings. It agreed with the parties that the recommended range of prison terms under the Sentencing Guidelines was 262 to 327 months and the mandatory minimum sentence was fifteen years. Tr. 21. Turning to the factors outlined in 18 U.S.C. § 3553(a), it remarked that there was no "need to go through in the record right now all of the sordid details of this offense" because Lombard had agreed with the facts contained in the Plea Agreement, all of which were "very explicit and very specific" and there was "no reason not to accept all of those facts as true." Tr. 22.

The Court stressed that it was not dealing with "one incident or two incidents," but rather with carefully planned conduct spanning a period of more than a year, which it could not attribute to Lombard's "recent diagnosis of bipolar disorder."[1] Tr. 27. The Court also explained that it found Lombard's extensive training in psychology and social work to be significant, because "Lombard doesn't have the excuse that he didn't realize what was happening. He . . . had to have known that what he was doing was sick, that it would horribly impact the little boy[.]" Tr. 25.

The Court observed that Lombard had a duty "to love and protect" his son, which was violated in the most "depraved and

---

[1] Defendant arranged to engage in the conduct to which he pled guilty when his partner was away on travel required by his employment. *See* Statement of the Offense ¶ 4.

perverted" way when he sexually abused the child, filmed the abuse with knowledge that the "images are going to be out on the Internet forever," and solicited others to molest his son as well. Tr. 25. The Court reflected that this conduct must have gravely impacted, not only the younger son, but also Lombard's older son and parents. Tr. 24, 27.

The Court considered the requirement, under 18 U.S.C. § 3553(a), that its sentence both adequately protect the public and also serve the goals of specific and general deterrence, and it concluded that it could "not in good conscience" sentence Lombard at the bottom or middle of the Guidelines range. Tr. 29. It stated that, "after many, many years on the bench, this is one of the worst offenses I have ever seen," Tr. 25, and explained that the 20-year sentence requested by the Government would result in Lombard being released "somewhere between the age of 57 or 58 . . . maybe even younger," at a time when there was "[n]o question in my mind that he would still be a great danger to the public." Tr. 27-28. Based on these considerations, the Court denied the Government's Motion for a downward departure and imposed the maximum Guidelines sentence of 327 months. Tr. 29.

### D. Post-Conviction Proceedings

On April 8, 2010, Lombard appealed his sentence, arguing that the Court failed to explain its rationale for denying the

Government's motion for a downward departure under Section 5K1.1 of the Sentencing Guidelines and did not appropriately consider mitigating factors under 18 U.S.C. § 3553(a). On May 24, 2011, the Court of Appeals rejected these arguments and affirmed. United States v. Lombard, 424 F. App'x 5, 6-7 (D.C. Cir. 2011). On October 31, 2011, the United States Supreme Court denied certiorari. Lombard v. United States, 132 S. Ct. 534 (2011).

On October 19, 2012, Lombard filed this Motion to Vacate pursuant to 28 U.S.C. § 2255, contending that Shella provided ineffective legal assistance during plea negotiations, at sentencing, and on direct appeal [Dkt. No. 34]. On March 11, 2013, the Government filed its Opposition [Dkt. No. 48]. On April 16, 2013, Lombard filed his Reply [Dkt. No. 51].[2] On April 24, 2014, the Court held a status conference and directed the parties to submit additional written statements describing the arguments or evidence they wished to present at a hearing on Petitioner's Motion, if any. On May 14, 2014, Petitioner submitted his Response ("Pet'r's 5/14 Resp.") [Dkt. No. 54]. On May 21, 2014, the Government submitted its Response ("Gov't's 5/21 Resp.") [Dkt. No. 55].

---

[2] Lombard filed his Petition pro se, but subsequently retained new counsel and has been assisted by such counsel on his Reply. [Dkt. Nos. 42 & 47].

- 9 -

## II. LEGAL STANDARD

### A. Standard Under 28 U.S.C. § 2255

A prisoner in custody under sentence of a federal court may move the sentencing court to vacate, set aside, or correct its sentence if the prisoner believes that "the sentence was imposed in violation of the Constitution or laws of the United States, . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The petitioner bears the burden of proving his entitlement to relief by a preponderance of the evidence. United States v. Simpson, 475 F.2d 934, 935 (D.C. Cir. 1973).

Section 2255 requires a district judge to hold a hearing on the petition unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. In interpreting this requirement, our Court of Appeals has held that:

> the judge's recollection of the events at issue may enable [her] summarily to dismiss a § 2255 motion; indeed, [her] ability to do so is one of the advantages of § 2255 relative to habeas corpus for state prisoners. Only where the § 2255 motion raises "detailed and specific" factual allegations whose resolution requires information outside of the record or the judge's "personal knowledge or recollection" must a hearing be held. Even if the files and records of the case do not clearly rebut the allegations of the prisoner, no hearing is required where his claims are "vague, conclusory, or palpably incredible."

United States v. Pollard, 959 F.2d 1011, 1030-31 (D.C. Cir. 1992) (citations omitted).

**B.   Ineffective Assistance of Counsel Standard**

Under the Sixth Amendment of the Constitution, an accused has the right to "reasonably effective assistance" of counsel. Strickland v. Washington, 466 U.S. 668, 687 (1984). This guarantee applies at all critical stages of a criminal proceeding, including sentencing and on direct appeal. See, e.g., Lafler v. Cooper, 132 S. Ct. 1376, 1385-86 (2012) (citations omitted).

To obtain relief, a prisoner must satisfy a two-part test. First, he or she must show that counsel's performance was objectively deficient. The Supreme Court has not articulated specific guidelines for appropriate attorney conduct and instead has emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (citations and punctuation omitted).

Second, the petitioner must show that the "deficient performance prejudiced the defense." Strickland, 466 U.S. at 687-88. "Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." United States v. Poynter, 509 F. App'x 2, 3 (D.C. Cir. 2013) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Knowles, 556 U.S. at 127.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

## III. DISCUSSION

### A.   Ineffective Assistance During the Plea Process

Petitioner claims that his attorney, Christopher Shella, was ineffective during the plea process because he "failed to timely investigate and negotiate . . . a favorable plea agreement." Mot. at 5.  In particular, Lombard complains that the Plea Agreement was entered pursuant to Fed. R. Crim. P. 11(c)(1)(B), which meant that it was not binding on the Court, rather than pursuant to Rule 11(c)(1)(C), "which would have bound both the government and the court to the sentence contemplated" in the Plea Agreement.  Id. at Statement of Claim ¶ 35.[3]

---

[3] Lombard also asserts that Shella failed to "keep him advised" of plea discussions or "any opportunities for a favorable plea agreement."   Pet. at Statement of Claim ¶ 34.   However, he provides no details regarding this alleged failure or how it prejudiced him.

### 1. Lombard Has Not Identified Any Deficiencies in Shella's Performance During the Plea Process

It is well-established that the Sixth Amendment's guarantee of effective counsel is applicable to representation during the plea process. For example, the Supreme Court has recently held that a defense attorney's failure to advise a defendant of a plea offer extended by the Government may constitute deficient performance under Strickland. Missouri v. Frye, 132 S. Ct. 1399 (2012). The Supreme Court has likewise held that errors of law that lead defense counsel to give improvident advice about whether a defendant should accept or reject a plea offer may render such assistance ineffective. See Lafler, 132 S. Ct. at 1376; Hill v. Lockhart, 474 U.S. 52 (1985); United States v. Rashad, 331 F.3d 908, 909 (D.C. Cir. 2003). To prevail on this claim, however, Lombard must demonstrate that Shella's performance during the plea process fell below an objective standard of reasonableness. Further, the Supreme Court has recognized, in the context of plea negotiations in particular, that negotiation is an "art" with myriad "alternative courses and tactics," Frye, 132 S. Ct. at 1408, and that the Sixth Amendment does not require counsel to pursue "every available nonfrivolous" path in such negotiations. Knowles, 556 U.S. at 127.

Lombard does not offer any specific reason why it was professionally unreasonable for Shella to advise him to enter a non-binding plea agreement. He does not suggest, as in Frye, that the Government ever extended him a binding plea offer that Shella failed to communicate to him. Frye, 132 S. Ct. at 1408; see also Lafler, 132 S. Ct. at 1387 ("If no plea offer is made, . . . the issue raised here simply does not arise."). Nor does he point to any legal errors by Shella during the plea process that affected his decision to accept a non-binding plea, as in Lafler.[4] See Lafler, 132 S. Ct. at 1383. Instead, he merely takes issue with the fact that the final plea agreement was non-binding, which ultimately operated to his detriment when the Court sentenced him to a higher sentence than the one contemplated by the Plea Agreement, although within the Guidelines.

Moreover, nonbinding pleas are specifically authorized under the Federal Rules of Criminal Procedure. The ABA Standards for Criminal Justice, which the Supreme Court has recognized state the prevailing norms of criminal defense practice, Padilla v. Kentucky, 559 U.S. 356, 366-67 (2010), indicate that nonbinding pleas are commonly used in the plea bargaining process. See ABA Standard 14-3.1(c)(i) (in exchange

---

[4] As discussed, the non-binding nature of the plea was spelled in the Plea Agreement itself, which Lombard indicated that he had read and discussed with his attorney. Plea Agreement at 4, 8.

for guilty plea, prosecuting attorney may agree "to make or not to oppose favorable recommendations or to remain silent as to the sentence which should be imposed if the defendant enters a plea of guilty"). Thus, there is nothing inherently unreasonable about Shella's advice that Lombard enter a non-binding plea agreement.

Nor was a non-binding plea agreement objectively unreasonable simply because the Court ultimately rejected the parties' proposed sentence. An attorney's effectiveness does not turn on the final outcome of the proceeding but on whether counsel exercised "reasonable professional judgment" based on "prevailing professional norms" and "counsel's perspective at the time." Rompilla v. Beard, 545 U.S. 374, 380-81 (2005) (citations omitted) (emphasis added). Lombard has not pointed to any circumstances that would have rendered a non-binding plea agreement for the mandatory minimum sentence unreasonable at the time it was entered.

Because nonbinding pleas are not inherently unreasonable and Lombard has not explained how or why Shella's advice to enter a nonbinding plea was objectively unreasonable at the time, his claim fails the first prong of Strickland.

## 2. Lombard Has Not Shown Prejudice

Even if Petitioner could show a specific, objective deficiency of his trial counsel during the plea process, he has

not shown any prejudice resulting from that deficiency. To do so, he must demonstrate a reasonable probability that both the Government and the Court would have agreed to a binding plea deal on terms he would have accepted more readily than the agreement he did accept. See Frye, 132 S. Ct. at 1410 (noting that the prejudice inquiry turns on "whether [the petitioner] would have accepted the offer to plead pursuant to the [different] terms" and whether the court and prosecutor would also have agreed to the deal); see also United States v. Williams, No. 88-410-CR (SSH), 1999 WL 1212883, at *5 (D.D.C. Oct. 25, 1999) ("[E]ven assuming that the government would have consented to a conditional plea, it in all likelihood would have modified the terms of its original plea offer to reflect the concession made to defendant, most likely in a way that would have increased defendant's sentence exposure.") (citations omitted).

There is no indication, and Lombard does not allege, that the Government was willing to entertain a binding plea agreement, much less on terms Lombard would have accepted more readily than the agreement he did accept. Thus, Lombard cannot establish prejudice. See United States v. Medina-Montes, 359 F. App'x 943, 944 (10th Cir. 2010) ("[Petitioner] baldly asserts that his trial counsel should have negotiated a conditional guilty plea . . . . There is absolutely nothing in the record

to indicate the prosecution was remotely willing to enter into such an arrangement."); Williams, 1999 WL 1212883, at *5 ("[B]ecause [defense counsel] was essentially powerless to effectuate a conditional plea, his alleged neglect to either advise defendant of the possibility of such a plea and or negotiate one on his behalf would not qualify as deficient performance[.]"); Ramos v. United States, No. 01 Cr. 10369 (PBS), 2012 WL 1109081, at *5 (D. Mass. Mar. 30, 2013) ("[Petitioner] asserts that counsel should have negotiated away [an] enhancement, but it takes two to tango. [Petitioner] does not explain why the government would have been a willing dance partner.").

In addition, Rule 11(c)(3) grants the trial court the discretion to reject a binding plea. Given the Court's unwillingness to adopt a low or mid-range sentence at sentencing, it is not reasonably probable the Court would have endorsed the same outcome simply because it was presented by means of a binding plea agreement. This is another reason Lombard cannot show prejudice.

In sum, Lombard's claim of ineffectiveness during the plea process lacks merit both because Lombard has not identified anything objectively deficient about Shella's performance, and because any contention that the Government would have offered a

binding plea on terms he and the Court would have accepted is entirely speculative.

## B.     Ineffective Assistance at Sentencing

Lombard also asserts that Shella was ineffective at sentencing for failing to obtain a professional psychosexual evaluation, which he contends "would have demonstrated that prison treatment programs for sex offenders are effective and that Mr. Lombard would not be a danger to the community upon release from prison after 20 years minus good time."  Mot. at Statement of Claim ¶ 30.

It is unnecessary to decide whether Shella's failure to obtain a psychosexual evaluation was objectively reasonable because Lombard cannot establish prejudice.  He has now retained Frank W. Isele, Ph.D., a clinical psychologist, for purposes of this Motion, to perform a psychosexual evaluation, and Dr. Isele's Report does little to alleviate the Court's expressed concerns regarding Lombard's likelihood of reoffending.  See generally Pet. Ex. F ("Report").

First, Dr. Isele suggests that, even with treatment, more than ten percent of sexual offenders reoffend.  Id. at 16 (citing Losel & Schmucker, 2005; Barbaree and Marshall, 1988).  Considering the nature of Lombard's offense, a greater than one in ten chance that Lombard will reoffend is significant and poses a material risk to the public.  Id.

Second, Dr. Isele's assessment was that Lombard himself presented a 9.0-15.7% risk of reoffending over a ten year period, a risk that appears to increase with the passage of time. See Report at 15. Dr. Isele also cautioned that Lombard's "child molestation score is in the 95th percentile suggesting that he is a pedophile, that his problem is severe and that he needs sexual treatment as well as supervision. . . . These results are not due to chance and should not be ignored." Report at 10 (emphasis added). These comments hardly reassure the Court that the risk is minimal.

Third, the Court made clear at sentencing that it did not consider Lombard to be a "typical" pedophile because even with his prior extensive psychosocial training, he failed to recognize the wrongfulness of his conduct and to seek treatment. Tr. 25-26. Dr. Isele's Report does not account for this important circumstance at all. See United States v. Miller, 601 F.3d 734, 739 (7th Cir. 2010) (observing that a court's sentence should be "sufficiently particularized to the individual circumstances of the case rather than factors common to offenders with like crimes").[5]

_____

[5] Furthermore, the Government is correct that while Dr. Isele has extensive experience as a clinical psychologist, he does not have any particular expertise with sexual offenders or their recidivism rates. See Report at 19-24. His only documented experience with anything remotely similar to his case is performing a psychological evaluation in United States v.

Finally, the Court's assessment of Lombard's future dangerousness was only one of several considerations underlying its sentencing determination. The Court was equally focused on the gravity and continuing nature of Lombard's offense and the resulting damage to his children, partner, and parents.

Because Dr. Isele's Report does little, if anything, to address the many concerns and considerations that led the Court to impose a maximum sentence, Shella's failure to obtain a psychosexual evaluation would not likely have produced a different outcome at sentencing, and thus, no Strickland prejudice resulted from that failure.

## C.    Ineffective Assistance on Direct Appeal

Finally, Lombard claims that Shella was ineffective on direct appeal because he did not challenge the following statements, which the Court made at sentencing:

> From all that I have read, none of the[] treatment programs [for sex offenders] work. We would like to think they do, but they don't. There is no scientific evidence showing that these treatment programs work, and that when people are released back into the community, as they must be, that children are safe from them. So therefore deterrence – general deterrence and specific deterrence - must be served by my sentence here, and the public must be protected from any contact whatsoever between Mr. Lombard and children.

---

Dorvee, 616 F.3d 174 (2d Cir. 2010), a child pornography case. Id. at 24. However, the facts in Dorvee were markedly different; namely, there was no evidence that the defendant had ever sexually assaulted a child.

Tr. 27-28.

Lombard contends that the Court's reference to recidivism rates and the inefficacy of treatment was improper because there was no evidence to that effect in the record. Lombard further claims that the Court's reliance on facts not in evidence supplied a stronger basis to challenge his sentence than the arguments Shella actually presented on appeal.

A claim of ineffectiveness on appeal is also governed by Strickland's two-part test. Deficient performance in this context means "that counsel unreasonably failed to discover nonfrivolous issues" to present on appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citation omitted). However, counsel "is not required to raise every non-frivolous issue on appeal." Martin v. Evans, 384 F.3d 848, 851-52 (7th Cir. 2004). An attorney's performance is objectively inadequate only if "he or she fails to argue an issue that is both obvious and clearly stronger than the issues raised." Id. (citations omitted). Prejudice is shown where there is a reasonable probability that but for counsel's omission, the petitioner "would have prevailed on his appeal." Smith, 528 U.S. at 285-96.

The Court need not decide whether Shella was ineffective in failing to argue that the Court's brief statements regarding recidivism rates and treatment of sex offenders were not

supported by any specific evidence in the record because it concludes that, in any event, Petitioner cannot show prejudice.

As discussed, to establish prejudice, Lombard must show a reasonable probability that, had Shella challenged the Court's statements about the efficacy of treatment programs on appeal, "the result of the appeal would have been different." United States v. Cook, 22 F. App'x 3 (D.C. Cir. 2001) (emphasis added) (citation omitted). Central to this determination is the standard of review that would have applied on appeal. Where a defendant raises an argument on appeal that was not raised before the district court, as was the case here, the Court of Appeals reviews the district court proceedings for "plain error." See United States v. Terrell, 696 F.3d 1257, 1260 (D.C. Cir. 2012). Error is "plain" if, at the time it was made, a "clear precedent in the Supreme Court or this circuit established its erroneous character." Id. (citation omitted).

It is well-established that a "district court is due substantial deference in its fact-based sentencing determinations" and is given a "wide latitude to decide what type of proof is, or is not, sufficiently trustworthy to enter into the sentencing calculus." United States v. Cunningham, 201 F.3d 20, 26 (1st Cir. 2000) (citations omitted). Further, a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial,

provided that the information has sufficient indicia of reliability to support its probable accuracy." United States v. Pletnyov, 525 F. App'x 1, 2 (D.C. Cir. 2013) (citing U.S.S.G. § 6A1.3).

Against this backdrop, Petitioner has not cited any "clear precedent" in the Supreme Court or this Circuit holding that a district court may not rely, in fashioning a within-Guidelines sentence, on its general awareness regarding recidivism rates and the usefulness of treatment programs in protecting the public from future offenses.

Nor has Petitioner presented any information whatsoever suggesting that the Court's concerns regarding recidivism were erroneous, inaccurate, or unreliable. To the contrary, the Court's concerns are supported by substantial authority. See, e.g., Smith v. Doe, 538 U.S. 84, 103 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); McKune v. Lile, 536 U.S. 24, 33 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); United States v. Irey, 612 F.3d 1160, 1214 (11th Cir. 2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); United States v. Allison, 447 F.3d 402, 405-06 (5th Cir.2006)

("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). Consequently, Petitioner has failed to show that the Court's consideration of recidivism and treatment constituted "plain error."

Moreover, a finding of plain error does not itself warrant reversal on appeal. The Court of Appeals will grant relief only if the error affected the defendant's "substantial rights." Terrell, 696 F.3d at 1263 (citations omitted).[6] An error affects a defendant's substantial rights if there is a "reasonable likelihood" that it affected the final outcome of the case. Id.

The Court's concerns regarding recidivism rates were not only supported by substantial authority, they also were only one of many considerations undergirding the Court's sentence. Lombard's sentence was grounded primarily on a variety of case-specific findings that were completely independent from any considerations of sex offenders in general. These included: (1) the nature of Lombard's offense, which the Court found to be

---

[6] A third and final element of plain error review is whether the district court's error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Terrell, 696 F.3d at 1263 (citing United States v. Olano, 507 U.S. 725, 732 (1993)). However, our Court of Appeals has held that this element is typically met where a defendant shows plain error at sentencing because "'keeping a defendant in prison longer for improper reasons' affects the fairness, integrity, and public reputation of judicial proceedings." Id. (quoting In re Sealed Case, 573 F.3d 844, 852-53 (D.C. Cir. 2009)).

"one of the worst offenses" it had ever seen after "many, many years on the bench"; (2) the fact that Lombard's conduct was highly organized and deliberate, occurred in spite of his extensive psychological and psychosocial training, and had been ongoing for well over a year; and (3) the prospect of long-lasting harm to Lombard's adopted child, as well as the rest of his family. In other words, notwithstanding the Court's brief consideration of the general efficacy of treatment for sex offenders, Petitioner's sentence was overwhelmingly based on case-specific considerations with substantial support in the record.

In other words, any error would not have affected Petitioner's substantial rights because the Court's concerns were firmly grounded in legal authority readily accessible to Petitioner and were only a small part of a comprehensive set of case-specific considerations supporting Petitioner's sentence.

For the foregoing reasons, the Court concludes that Petitioner has not demonstrated prejudice as to his claim for ineffectiveness of appellate counsel and, therefore, cannot prevail on that claim.[7]

---

[7]   In addition to the three claims discussed, Lombard also brings a fourth claim arguing that he was prejudiced by the cumulative impact of his counsel's deficiencies during plea negotiations, at sentencing, and on direct appeal. Pet. at 6. Assuming such a theory applies to ineffective representation at three discrete *stages of the criminal process*, it does not apply here because,

**D. Lombard's Request for an Evidentiary Hearing Is Denied**

As discussed, a hearing is not required under § 2255 where the "files and the records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). As our Court of Appeals has explained, a hearing is required "[o]nly where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection[.]'" Pollard, 959 F.2d at 1031 (citations omitted).

The Court concludes that no evidentiary hearing is required. As discussed above, Lombard's ineffectiveness claim regarding plea negotiations can be resolved without an evidentiary hearing because he fails to identify any specific way in which Shella's performance was objectively deficient or prejudicial. Similarly, his ineffectiveness claim based on Shella's failure to obtain a psychosexual evaluation and his appellate ineffectiveness claim can both be disposed of without an evidentiary hearing due to his inability to show prejudice.[8]

---

as discussed, Lombard has not identified any deficiency during the plea process, and any deficiencies at sentencing and on appeal were not prejudicial.

[8] Petitioner acknowledges that there are no material factual issues in dispute and "[t]he only purpose for an evidentiary hearing . . . might be if the Court would choose to learn more about Dr. Isele's evaluation of Mr. Lombard to decide whether counsel's failure to present this evaluation undermines

See <u>Burroughs</u>, 613 F.3d at 239 (without "any substantial issue that requires a determination of facts" no evidentiary hearing is required to deny claim under § 2255).  Consequently, Petitioner's request for an evidentiary hearing shall be **denied**.[9]

## IV.  Conclusion

For the foregoing reasons, Petitioner's Motion to Vacate is **denied**.  An Order shall accompany this Memorandum Opinion.

May 23, 2014

Gladys Kessler
United States District Judge

**Copies to:  Attorneys of Record via ECF**

_____

confidence that the Court would have imposed a sentence above the 20 years recommended by the prosecutor." Pet'r's 5/14 Resp. at 1 [Dkt. No. 54].  For the reasons discussed at length in part III.B of this Memorandum Opinion, the Court does not need further information regarding Dr. Isele's evaluation to determine that Lombard was not prejudiced by Shella's failure to obtain a psychosexual evaluation at sentencing.

[9] For the same reasons, Lombard's request that the Court permit him the opportunity to depose Shella and the prosecutor at trial _is also_ **denied**.